# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**LAUREN N. TRUJILLO,**

      Plaintiff,

v.

**RIO GRANDE COUNTY SHERIFF'S OFFICE**, and

**BOARD OF COUNTY COMMISSIONERS OF RIO GRANDE COUNTY**,

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Lauren N. Trujillo ("**Ms. Trujillo**" or "**Plaintiff**") through her undersigned counsel, submits this Complaint and Jury Demand against the Rio Grande County Sheriff's Office and the Board of Commissioners of Rio Grande County (together, the "**Sheriff's Office**," or "**Defendants**").

### PARTIES

1.      Plaintiff is an individual who currently resides at 6115 Ursa Ave NW, Albuquerque, New Mexico 87114.  At all times relevant to this matter, Plaintiff resided in Rio Grande County, Colorado.

2.      The Sheriff's Office is a law enforcement agency and is located at 640 Cherry Street, Del Norte, Colorado 81132.

3.      The Board of County Commissioners of Rio Grande County (the "**County Commissioners**") are the elected officials who make governing decisions for Rio Grande County, Colorado.  At this time, they are Scott Deacon, Gene Glover, and John Noffsker.  The principal office of the County Commissioners is located at 965 6th Street, Room 207, Del Norte, Colorado 81132.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Ms. Trujillo's claims pursuant to 28 U.S.C. §§ 1331 and 1343.   This action is authorized by, and instituted under, the Americans with Disabilities Act of 1990, as amended, and the Americans with Disabilities Act Amendments Act of 2008 (together, the "**ADA**") and Title VII of the Civil Rights Act of 1964, as amended ("**Title VII**").  See 42 U.S.C. § 126-12101, *et seq*.; 42 U.S.C. § 2000e, *et seq*.; 42 U.S.C. § 12203.

5.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as the claims arise out of the same case and/or controversy as Plaintiff's federal question claims.

6.      The unlawful employment practices alleged herein were committed within the judicial district of the United States District Court for the District of Colorado.  Accordingly, venue is proper in this District pursuant to 28 U.S.C. § 1391.

## ADMINISTRATIVE PROCEDURES

7.      On or about November 10, 2021, Ms. Trujillo filed an Amended Charge of Discrimination with the Equal Employment Opportunity Commission ("**EEOC**") and Colorado Civil Rights Division ("**CCRD**"), related to discrimination based on disability, gender, national origin/ancestry, and retaliation.

8.     Right to Sue notices were issued to Ms. Trujillo by the CCRD and the U.S. Department of Justice (on behalf of the EEOC), authorizing Ms. Trujillo to bring the present lawsuit.  Ms. Trujillo timely brings her legal claims against Defendants after exhausting her administrative remedies.

**GENERAL ALLEGATIONS**

*Employer and Employee Information*

9.     The Sheriff's Office is an employer pursuant to the ADA, Title VII, and CADA, and at all times material hereto has employed more than fifteen employees.

10.     Ms. Trujillo is a Hispanic female who was born and raised in Rio Grande County, Colorado, where her family has resided for many generations.

11.     On or about June 3, 2019, Ms. Trujillo began work as a Dispatcher for the Sheriff's Office.

12.     Throughout her employment with the Sheriff's Office, Donald McDonald ("**Sheriff McDonald**"), a white male, was the Rio Grande County Sheriff.  Sheriff McDonald was elected to his position and served until resigning in June 2022, upon information and belief, following a vote of no confidence by Sheriff's Office employees.

13.     Ms. Trujillo was terminated from her employment with the Sheriff's Office by Sheriff McDonald on or about February 12, 2021.

*Ms. Trujillo's Employment at the Sheriff's Office*

14.     Ms. Trujillo's work as a Dispatcher for the Sheriff's Office was performed in the Dispatch Center, which is located inside the building also shared by the Sheriff's Office and the Rio Grande County Jail ("**Jail**").  The Dispatch Center is staffed 24 hours a day.

3

15.     In order to reach the Dispatch Center, employees must pass through two secure doors and through the Jail.

16.     As a Dispatcher, Ms. Trujillo's role was to answer emergency calls and to dispatch appropriate personnel to address those emergencies.  Dispatchers question callers to determine the seriousness of the emergency and determine the response needed.  Dispatchers also coordinate all police, fire, ambulance, and other emergency requests by relaying information and instructions to the closest and most suitable response units.

17.     Dispatchers answer emergency calls and non-emergency calls made to the Sheriff's Office and monitor radio traffic for police and Del Norte Emergency Medical Services.

18.     Dispatchers also perform general administrative tasks, log calls, and provide information to Sheriff's Deputies, such as requested information from crime databases.

19.     Ms. Trujillo, despite her genuine interest in learning the job and the fact she was raised in the community, was often openly disrespected by white non-Hispanic ("**White**") male Sheriff's Office employees, including Sheriff McDonald.

20.     Ms. Trujillo overheard countless derogatory comments made by her White male coworkers about women and individuals of Hispanic origin or ancestry (together, "**Hispanic ancestry**").

21.     Sheriff McDonald frequently referred to Hispanic individuals, who make up a sizeable percentage of the population in Rio Grande County, as the "blackwater association," meaning Hispanic individuals were the sewer water of the community.

22.     White male employees of the Sheriff's Office, including Deputies and members of leadership, commonly referred to Hispanic individuals as being "ghetto," and with other derogatory terms.

23.     In what would become a common occurrence, Ms. Trujillo quickly noticed that as she moved throughout the Sheriff's Office her presence was ignored by her White male coworkers, including Sheriff McDonald, even when she attempted to initiate interactions.

24.     Ms. Trujillo noticed that when she would walk down the hallway with a White coworker, Sheriff McDonald would exchange pleasantries and/or conversation with the White coworker without ever greeting, or even making eye contact, with Ms. Trujillo.  This happened more than four times.  Ms. Trujillo also witnessed Sheriff McDonald ignore greetings from other Hispanic employees while consistently responding to greetings from White employees.

25.     Just prior to her start date, Ms. Trujillo was at the Sheriff's Office and was introduced to Heath Hart ("**Mr. Hart**"), Rio Grande County's current Undersheriff.  Mr. Hart refused to shake Ms. Trujillo's hand, though she had just seen him shake a White male coworker's hand.

26.     Sheriff McDonald questioned a Hispanic female Detention Officer, asking her if she wanted to release immigration holds on undocumented detainees of Hispanic or Latino ancestry, accusing her of wanting to "release some of [her] people."

27.     Leadership within the Sheriff's Office was overwhelmingly White.  The highest-ranking Hispanic employee was promoted to Sergeant before Sheriff McDonald took office.

28.     In late July 2020, Ms. Trujillo witnessed Sheriff McDonald promote an under-qualified White male to Patrol Sergeant over two longer-serving Hispanic men who had also applied for the promotion.

### *The Sheriff's Office Maintains Facially-Discriminatory Policies*

29.     Dispatchers were required to wear uniforms, which consisted of grey pants and shirts with the Sheriff's Office patches on them.  The Sheriff's Office provided full uniforms to male employees without charge, but in many cases only provided partial uniforms to its female employees.

30.     When Ms. Trujillo was issued her uniforms, the pants did not fit.  She realized they were men's pants, not designed to accommodate basic features of female bodies and did not fit Ms. Trujillo.

31.     Ms. Trujillo brought this to the attention of her direct supervisor, Dispatch Corporal, Emily Lopez ("**Corporal Lopez**").  Corporal Lopez said that the Sheriff's Office only supplies men's pants and shirts and if those did not fit, Ms. Trujillo would have to buy her own. After spending approximately $200 on her own uniform pants, Ms. Trujillo was told that she would not be reimbursed for the cost.

32.     The Sheriff's Office did not make all shifts available to female Dispatchers.  Ms. Trujillo made a number of requests to change her schedule, but was refused solely because of her gender.

33.     Ms. Trujillo requested to work the mid shift, which was the 10:00 p.m. to 6:00 a.m. shift.  She made this request during her initial interview and a number of times thereafter, indicating that she preferred to work overnight shifts.  Each time she made her request she was

plainly told that she would never be scheduled to work the mid shift because she is a woman. She did work the mid shift, however, when male Dispatchers called in sick and during COVID when the Sheriff's Office was understaffed.

34.     Lieutenant Alan Beechum is one of the supervisors who told Ms. Trujillo that only male Dispatchers can be scheduled to work the mid shift.  He said this was due to safety reasons, but female Dispatchers frequently filled in for male Dispatchers on the mid shift when they called in sick or otherwise had to miss work.

35.     The mid shift was notoriously difficult to staff, as none of the male Dispatchers wanted to work during the night.

36.     Ms. Trujillo is aware of at least one other female Dispatcher who requested to work the mid shift.  She also denied her preferred schedule solely on the basis of her gender, despite having also worked the mid shift to fill in for male coworkers.

37.     On multiple occasions Ms. Trujillo complained to Jail Sergeant Jared Quintana and her direct supervisor, Corporal Lopez, about the policy, specifically telling them she believed the policy was discriminatory.

38.     Sheriff McDonald and other Sheriff's Office leadership told Ms. Trujillo that female Dispatchers could <u>work</u> the mid shift, but could not be <u>scheduled</u> to work the mid shift. Occasionally, a female Dispatcher would also be scheduled to fill in on a mid shift when the regularly-scheduled male Dispatcher had previously-approved time off, such as vacation.

39.     Female Dispatchers, including Ms. Trujillo, were scheduled to work the mid shift during COVID when there were not enough staff to maintain a regular schedule.  During that time, it apparently was not too "unsafe" for Ms. Trujillo and other women to work the mid shift.

40.     There were no restrooms in the Dispatch Center.  Certain shifts are staffed by one Dispatcher who cannot leave the Dispatch Center unless a dispatch-trained deputy was on duty in the Jail, something that happened regularly.  Leaving the Dispatch Center unstaffed would leave emergency calls unanswered, among other issues.

41.     Ms. Trujillo was told that leaving the Dispatch Center unstaffed during a shift, regardless of the reason, would be considered abandoning her job and lead to immediate termination.  Dispatchers were also told that if they left the Dispatch Center unattended they could – and would – be charged with a crime.

42.     Ms. Trujillo asked about how to handle bathroom breaks while working alone when there was no dispatch-trained deputy on duty in the Jail to cover for her.

43.     Ms. Trujillo was told that if she needed coverage for a break, it was up to her to call off-duty Dispatchers and find someone willing to come in and cover for her so she could leave the Dispatch Center to use the restroom or get something to eat.

44.     Male Dispatchers told Ms. Trujillo they regularly urinated into empty water bottles or other beverage containers while alone in the Dispatch Center.  Female Dispatchers were frequently left without breaks for their entire shifts, unable to use the restroom, including to change sanitary products.

### *Ms. Trujillo is an Individual with a Disability*

45.     Ms. Trujillo has asthma and hypoglycemia.  Ms. Trujillo carries a prescription inhaler with her at all times for emergency treatment of her asthma.  Due to her hypoglycemia, Ms. Trujillo must always have her blood sugar monitor and food available to test and maintain healthy blood sugar levels.

46.     At the beginning of her employment, Ms. Trujillo carried a bag with these items with her into the Dispatch Center.  There appeared to be no issue with Ms. Trujillo bringing these items with her into the Dispatch Center in a bag, until Sheriff McDonald instituted a new policy following an incident where illegal drugs were found in the Jail.  Sheriff McDonald barred employees from carrying bags or bringing medications into the Jail or Dispatch Center.

47.     Dispatchers had assigned lockers in which they could store personal items during their shifts.  The lockers, however, are not near the Dispatch Center, as they are located in the administrative area of the Sheriff's Office, which required Dispatchers to go through two secure doors.

48.     Ms. Trujillo told her supervisor that she needed to bring her medical items with her into the Dispatch Center and could not do so under the Sheriff's new policy.

49.     As a result of the Sheriff's Department's inaction on the matter, Ms. Trujillo began carrying her necessary items into the Dispatch Center in a cardboard box to avoid the "no bag" policy.  For more than a year, no one commented or had concerns about this practice.  It was not until the events leading up to Ms. Trujillo's termination that it became an issue and was considered by management a policy violation.

50.     Ms. Trujillo advised a number of supervisors and coworkers of her medical conditions, including her direct supervisor Corporal Lopez.  She also openly discussed her medical conditions in departmental meetings during discussions about Sheriff McDonald's "no bag policy."

51.     In addition to advising Corporal Lopez, Ms. Trujillo also told the Captain in charge of the Jail that she needed to bring these medical items with her into the Dispatch Center.

9

He indicated he would speak with Sheriff McDonald about the matter and later told Ms. Trujillo that the Sheriff would not make an exception to the policy for her.

### *The Events Surrounding Ms. Trujillo's Termination*

52.　　In the evening hours of Friday, January 8, 2021, a female individual had been taken into custody by the Sheriff's Office and was detained in the Jail.

53.　　This female detainee reported to a Sheriff's Office employee that she had been raped prior to being taken into custody and, as a result, was experiencing vaginal bleeding. She requested medical attention.

54.　　Ms. Trujillo was working in the Dispatch Center that evening and received a call from a coworker that a detainee was requesting medical attention. She was then told by Corp. Pete Valdez to notify the on-duty transport officer that a detainee needed to be transported to Rio Grande Hospital ("**Hospital**").

55.　　A short time later, Ms. Trujillo was told that a decision had been made to send the detainee to the Hospital the next morning, rather than that same evening.

56.　　To Ms. Trujillo, the Sheriff's Office and Sheriff McDonald had decided to require a woman who had been sexually assaulted to remain un-showered, bleeding, and in need of medical attention for more than 12 additional hours.

57.　　Ms. Trujillo knew of many incidents where male detainees were injured and bleeding and received immediate medical attention, yet this woman was forced to wait until morning to be seen by a medical professional.

58.　　Ms. Trujillo was shocked to hear of the delay in treatment for the female detainee and decided to discuss the matter with an on-duty supervisor.

10

59.     Sheriff McDonald was on-shift that evening and answered Ms. Trujillo's call, wherein she made her position clear – a woman had been raped, was bleeding, and needed medical attention immediately, not the next morning.

60.     The Sheriff's Office has audio recordings of all calls, including this call.

61.     Ms. Trujillo's complaint to Sheriff McDonald about the discriminatory treatment of the female detainee constituted protected opposition to the Sheriff's Office's violation of the female detainee's Civil Rights based on her gender.  Coworkers present that evening saw and heard what transpired.

### Following her Protected Complaint, Ms. Trujillo is Placed on Administrative Leave and then Terminated

62.     On Wednesday, January 20, 2021, less than two weeks after her complaint to Sheriff McDonald about the Sheriff's Office's discriminatory handling of the female detainee, Sheriff McDonald officially notified Ms. Trujillo that he was placing her on administrative leave so the Sheriff's Office could investigate what he described as "an incident that involved you and also social media."

63.     The investigation was initiated following a conveniently-timed, anonymous complaint about a handful of old video clips posted to Ms. Trujillo's TikTok account.

64.     What the County's own investigation report demonstrates is that on Friday, January 8, 2021, Ms. Trujillo expressed opposition what she believed was a discriminatory practice related to the mistreatment of a female detainee.  In response to her opposition, Sheriff McDonald told her it was not her place to "demand" action on behalf of a female detainee who had been raped.

11

65.     On or about Wednesday, January 20, 2021, Sheriff McDonald directed an investigation into Ms. Trujillo because of the "tone and verbiage" of her complaint 12 days prior.

66.     It appears from the report of the "thorough" investigation completed by Mr. Hart, that the only individual not questioned in relation to the allegations against Ms. Trujillo was Ms. Trujillo herself.

67.     When she was placed on administrative leave, Ms. Trujillo was told she would be interviewed as part of the investigation.  She was never contacted for an interview and her next communication from the Sheriff's Office was notification of her termination.  Ms. Trujillo was never given the opportunity to present her perspective of what had transpired on January 8, 2021, the reality of the videos she shared on TikTok, and the multitude of complaints of discrimination she had made prior to that date.

68.     On or about Friday, February 12, 2021, and after reviewing the investigation report prepared by Mr. Hart, Sheriff McDonald made the decision to terminate Ms. Trujillo's employment.

## FIRST CLAIM FOR RELIEF
### Failure to Accommodate in Violation of the ADA and CADA

69.     Ms. Trujillo incorporates each of the allegations set forth above, as if fully set forth herein.

70.     At all times relevant hereto, the Sheriff's Office was and is subject to the ADA and Colorado's Anti-Discrimination Act ("**CADA**").

71.     At all times relevant hereto, Ms. Trujillo was a disabled person within the meaning of the ADA and CADA.

72.     Ms. Trujillo suffers from asthma, which limits several major life activities, including breathing.

73.     Ms. Trujillo suffers from hypoglycemia, which limits several major life activities, including digestion and endocrine function.

74.     At all times relevant hereto, Ms. Trujillo was qualified and able to perform the essential functions of her position as a Dispatcher.

75.     Ms. Trujillo's supervisors and the Sheriff's Office knew or reasonably should have known that Ms. Trujillo was disabled.

76.     Following Sheriff McDonald's "no bag" policy, Ms. Trujillo asked a number of supervisors about obtaining an accommodation that would allow her to carry medically-necessary medical items, including her blood glucose meter and inhaler, into the Dispatch Center.

77.     The Sheriff's Office failed to engage in the interactive process and merely told Ms. Trujillo the policy would not be changed and an exception would not be made for her.

78.     The Sheriff's Office engaged in discriminatory practices with malice and/or with reckless indifference to Ms. Trujillo's rights and wellbeing, as set forth in the preceding paragraphs.

79.     Such conduct denied Ms. Trujillo equal terms, conditions, and privileges of employment, thereby violating Ms. Trujillo's rights.

80.     As a result of the conduct as above alleged, Ms. Trujillo has been damaged in an amount to be determined at trial, including but not limited to, compensatory damages for back

13

pay, front pay, lost job benefits, damages for emotional distress and pain and suffering, punitive

damages, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

**SECOND CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII and CADA**

81.     Plaintiff incorporates each of the allegations set forth above, as if fully set forth

herein.

82.     Plaintiff engaged in protected activity by complaining to Sheriff McDonald about

the Sheriff's Office's discriminatory treatment of a female detainee who reported as having been

sexually assaulted.

83.     Plaintiff opposed what she believed, in good faith, was discriminatory conduct by

the Sheriff's Office based on gender.

84.     In response to Plaintiff's complaint, Defendants launched an investigation into

Plaintiff's conduct, impugning the complaint Plaintiff made, as well as old social media posts,

yet failed to even interview Ms. Trujillo in the allegedly "thorough investigation."

85.     In further retaliation for her protected conduct, upon information and belief, the

Sheriff's Office disputed Ms. Trujillo's unemployment benefits, despite the fact she had no

previous disciplinary action or any warning prior to her termination, and had not even been given

the opportunity to provide her perspective of any alleged misconduct.

86.     The adverse actions taken by the Sheriff's Office against Ms. Trujillo, including

terminating her employment, were in retaliation for her protected activity.

87.     The justifications given by Defendants for Plaintiff's termination were generic

and ambiguous allegations of policy violations, untrue, and misleading.  In short, they were

pretext for illegal retaliation.

14

88.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered

damages including lost wages and benefits, diminished reputation, emotional pain and suffering,

mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in

amounts to be determined at trial.

## THIRD CLAIM FOR RELIEF
### Discrimination and Harassment in Violation of Title VII and CADA

89.     Plaintiff incorporates each of the allegations set forth above, as if fully set forth

herein.

90.     At all times relevant hereto, the Sheriff's Office was and is an Employer as

defined by Title VII and CADA.

91.     At all times relevant hereto, Plaintiff was qualified to perform the duties of her

position as Dispatcher.

92.     Plaintiff is female and of Hispanic ancestry.  Therefore, she is a member of

protected classes under Title VII and CADA.

93.     The Sheriff's Office and Plaintiff's managers knew Plaintiff is female and

Hispanic.

94.     Based on the facts alleged supra, during the course of Plaintiff's employment with

Defendants, Defendants, by and through their Sheriff and other employees, discriminated against

Plaintiff in the terms, conditions, and privileges of employment, because of her gender and

because she is of Hispanic ancestry, and/or the intersectionality of her protected classes, all in

violation of Title VII and CADA.

95.     Based on the facts alleged supra, Defendants, by and through their Sheriff and

other employees, created a hostile work environment that altered the terms and conditions of

15

Plaintiff's employment, because of her gender and/or Hispanic ancestry, and/or the intersectionality of her protected classes, all in violation of Title VII and CADA.

96.     The conduct of the Sheriff's Office and Ms. Trujillo's managers, supervisors, and HR personnel at the Sheriff's Office in their disparate treatment and harassment of Ms. Trujillo, as alleged in the preceding paragraphs (¶¶ 19-27; 28-44; 45-50), was and is intentional and due to Ms. Trujillo's gender and/or Hispanic ancestry, and/or the intersectionality of her protected classes, all in violation of Title VII and CADA.

97.     The Sheriff's Office and Ms. Trujillo's managers, supervisors, and HR personnel at the Sheriff's Office engaged in discriminatory practices with malice and/or with reckless indifference to Ms. Trujillo's rights, as set forth in the preceding paragraphs.

98.     Such conduct denied Ms. Trujillo equal terms, conditions, and privileges of employment, thereby violating Ms. Trujillo's rights as guaranteed by Title VII and CADA.

99.     As a result of the conduct of the Sheriff's Office and Ms. Trujillo's managers, supervisors, and HR personnel at the Sheriff's Office as above alleged, Ms. Trujillo has been damaged in an amount to be determined at trial, including but not limited to the following categories of damages: compensatory damages for back pay, lost job benefits, damages for emotional distress and pain and suffering, punitive damages, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Trujillo prays for entry of judgment in her favor and against the Rio Grande County Sheriff's Office and the Board of County Commissioners of Rio Grande County as follows:

a. Economic damages, including without limitation, back pay and lost benefits;

b. Compensatory damages, including without limitation, damages for loss of reputation, loss of opportunity for professional growth, loss of opportunity for promotion, additional financial incidental and consequential damages;

c. Non-economic damages for emotional distress, pain and suffering, inconvenience, mental anguish, loss of reputation, and other non-pecuniary losses;

d. Punitive damages as allowed by law and to be determined at trial;

e. Declaratory relief;

f. Reasonable attorneys' fees and costs;

g. Pre- and post-judgment interest; and

h. Such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Dated: August 8, 2022

By:   /s/ *Leah P. VanLandschoot*
Leah P. VanLandschoot, #35723
Amy M. Maestas, #46925
THE LITIGATION BOUTIQUE LLC
78 West 11th Avenue
Denver, Colorado 80204
T: 303.355.1942
F: 303.355.2199
Email: lvanlandschoot@thelitbot.com
Email: amaestas@thelitbot.com
**ATTORNEYS FOR PLAINTIFF
LAUREN TRUJILLO**

**Plaintiff's Address:**
6115 Ursa Ave NW
Albuquerque, New Mexico 87114

17