**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01981-NYW-KAS

LAUREN N. TRUJILLO,

     Plaintiff,

v.

RIO GRANDE COUNTY SHERIFF'S OFFICE, and
BOARD OF COUNTY COMMISSIONERS OF RIO GRANDE COUNTY,

     Defendants.

---

**MEMORANDUM OPINION AND ORDER**

---

This matter is before the Court on Defendants' Motion for Summary Judgment (or "Motion"). [Doc. 88].[1]  Plaintiff Lauren Trujillo ("Plaintiff" or "Ms. Trujillo") has responded. [Doc. 95].  Defendants Rio Grande County Sheriff's Office ("RGSO") and Board of County Commissioners of Rio Grande County ("County") (together, "Defendants") have replied. [Doc. 97].  Upon review, the Court concludes that oral argument would not materially assist in resolving the Motion.  For the reasons set forth below, the Motion for Summary Judgment is respectfully **GRANTED in part** and **DENIED in part**.

**BACKGROUND**

Until February 2021, Ms. Trujillo worked as a dispatcher for RGSO.  [Doc. 88 at ¶¶ 2–3, 26; Doc. 95 at 2, 4 ¶ 26].  Defendants assert that RGSO terminated Ms. Trujillo

---

[1] Where the Court refers to filings in the Electronic Case Files ("ECF") system in this action, it uses the convention [Doc. ___] and refers to the page number assigned by the ECF system, except when citing from the transcript of a deposition.  When citing the transcript of a deposition, the Court uses the ECF docket number, but cites to the page and line numbers as assigned in the original transcript.

because she violated several workplace policies.  *See, e.g.*, [Doc. 88 at 20].  Ms. Trujillo claims RGSO used the alleged policy violations as a pretext for discrimination and retaliation.  *See* [Doc. 32].  She brings three claims challenging various aspects of her employment with RGSO.

First, Ms. Trujillo asserts a claim for failure to accommodate under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 (collectively, "ADA"), 42 U.S.C. §§ 12101–12213, and under the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. §§ 24-34-401 to -408.  [Doc. 32 at ¶¶ 82–93].  Ms. Trujillo asserts that she is disabled based on her asthma and hypoglycemia,[2] which require her to keep an inhaler, blood glucose monitor, and other medically necessary items on hand at all times.  [*Id.* at ¶ 57].  But RGSO maintains a "no-bag" policy that forbids personal items in the dispatch room, and Ms. Trujillo alleges that RGSO failed to grant her an accommodation permitting her to bring her medically necessary items into the dispatch room.  [*Id.* at ¶¶ 58–63].

Second, Ms. Trujillo brings a claim for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, and CADA.  [Doc. 32 at ¶¶ 94–101].  She alleges that she engaged in protected opposition to discrimination on January 8, 2021, when she complained to her superiors that RGSO failed to provide adequate medical care to a female detainee who said she had been sexually assaulted.  [*Id.* at ¶¶ 64–73].  Less than two weeks later, RGSO began investigating her for violations of workplace policy based on, among other things, several videos that Ms. Trujillo recorded at RGSO's

---

[2] Hypoglycemia refers to an "abnormal decrease" in blood sugar.  *Hypoglycemia*, Merriam Webster, https://www.merriam-webster.com/dictionary/hypoglycemia (last visited Sept. 29, 2025).

facility and later posted on TikTok.  [*Id.* at ¶¶ 74–75; Doc. 88-21 at 115:17–25].  Sheriff Donald McDonald ("Sheriff McDonald") ultimately terminated her for purported violations of workplace policy.  [Doc. 32 at ¶ 80; Doc. 88-16].  Ms. Trujillo asserts that this constitutes unlawful retaliation.  [Doc. 32 at ¶¶ 94–101].

Third, Ms. Trujillo brings a claim for discrimination and harassment based on sex and national origin under Title VII and CADA.  [*Id.* at ¶¶ 102–12].  She asserts that Sheriff McDonald frequently referred to individuals of Hispanic ancestry as the "blackwater association," meaning sewer water, and that other White employees made similar derogatory comments.  [*Id.* at ¶¶ 32–34].  Ms. Trujillo also alleges that RGSO maintained policies that discriminated against female employees.  For instance, RGSO provided uniforms that did not fit her and were not "designed to accommodate the basic features of female bodies."  [*Id.* at ¶¶ 41–42].  When Plaintiff purchased her own uniform pants, RGSO refused to reimburse her.  [*Id.* at ¶ 43].  Plaintiff further alleges that she requested to work the night shift, also referred to as the "mid shift," but RGSO refused to schedule female employees for the night shift for "safety reasons."  [*Id.* at ¶¶ 44–48].  Plaintiff contends that these facts add up to a hostile work environment based on her sex and national origin.  [*Id.* at ¶ 108; Doc. 95 at 19–21].

Defendants seek summary judgment on all three claims.  [Doc. 88].

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve

the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

If the movant demonstrates that no genuine issues of material fact exist, the burden shifts to the non-movant to "set out specific facts showing a genuine issue for trial."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (quoting Fed. R. Civ. P. 56(e)(2)).  The non-movant must point to competent evidence showing a genuine factual issue; it cannot rely on "[u]nsubstantiated allegations" or "mere speculation, conjecture, or surmise."  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). In considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses.  *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).  At all times, the Court views the record in the light most favorable to the nonmoving party.  *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## UNDISPUTED MATERIAL FACTS

The Court draws the following material facts from the summary judgment record. These facts are undisputed unless otherwise noted.

## I.    Plaintiff's Employment with RGSO

1.    Plaintiff began working for RGSO as a dispatcher in May 2019.  [Doc. 88 at ¶ 2; Doc. 95 at 2; Doc. 88-1].

2.    She received her paychecks from the County.  [Doc. 95 at 7 ¶ 2; Doc. 97 at 2 ¶ 2; Doc. 95-10].

3.      As an RGSO employee, Plaintiff was subject to Policy Number 209, which covers electronic communications, social media, and internet use.  [Doc. 88 at ¶ 5; Doc. 95 at 2; Doc. 88-3].

4.      Policy Number 209 requires that, when an employee self-identifies as an RGSO employee on the internet, the employee must include a disclaimer that his or her views are not the views of the RGSO.  [Doc. 88 at ¶ 6; Doc. 95 at 2; Doc. 88-3 at 2–3].

5.      Plaintiff was also subject to Policy Number 312, covering rules of conduct, which requires employees to comply with a superior's lawful order and prohibits employees from engaging in entertainment while on duty.  [Doc. 88 at ¶¶ 9–10; Doc. 95 at 2; Doc. 88-6 at 1 ¶ 1; *id.* at 2 ¶ 6].

6.      Policy Number 901 required Plaintiff and other RGSO employees to store their personal items in a locker while on duty, and provided that only a water bottle or thermos was permitted inside the "controlled facility."  [Doc. 88 at ¶¶ 11–12; Doc. 95 at 2; Doc. 88-7 at 1–2].

7.      On or about January 15, 2021, an RGSO employee alerted Undersheriff Chris Crown ("Undersheriff Crown") that Plaintiff had posted videos on TikTok about her work at RGSO that, in the employee's opinion, "reflected badly on [RGSO's] image." [Doc. 88 at ¶ 13; Doc. 95 at 2 ¶ 13; Doc. 88-8].

8.      Sheriff McDonald assigned Sergeant Investigator Tristan Van Zalinge ("Sergeant Van Zalinge") to investigate the report regarding Plaintiff's TikTok videos for possible violations of RGSO policy.  [Doc. 88 at ¶ 14; Doc. 95 at 2–3 ¶ 14; Doc. 88-8; Doc. 95-2 at 47:21–48:17].

9.      Sheriff McDonald placed Plaintiff on paid administrative leave pending the investigation.  [Doc. 88 at ¶ 15; Doc. 95 at 3 ¶ 15; Doc. 88-9].

10.      After reviewing Plaintiff's TikTok account, Sergeant Van Zalinge determined that Plaintiff had committed "possible Policy and Procedure Violations" of several RGSO policies.  [Doc. 88 at ¶ 18; Doc. 95 at 3 ¶ 18; Doc. 88-10 at 8].

11.      Sergeant Van Zalinge also investigated an incident on January 8, 2021— before the discovery of Plaintiff's TikTok account—in which Plaintiff may have been insubordinate to Sheriff McDonald.  [Doc. 88 at ¶ 21; Doc. 95 at 3 ¶ 21; Doc. 88-10 at 5–7; Doc. 88-12].[3]

12.      As described by Nurse Sarah Herrera ("Nurse Herrera"), the January 8, 2021 incident involved a female detainee complaining that she had been sexually assaulted.  [Doc. 88 at ¶ 29; Doc. 95 at 2; Doc. 88-18].

13.      Nurse Herrera is a registered Sexual Assault Nurse Examiner[4] (or "SANE") and oversees medical care of inmates at the RGSO detention center.  [Doc. 88 at ¶ 31; Doc 95 at 2; Doc. 88-18].

14.      On January 8, 2021, after the female detainee complained about the alleged sexual assault, Nurse Herrera instructed detention staff "on how to proceed."  [Doc. 88 at ¶ 30; Doc. 95 at 2; Doc. 88-18].

---

[3] Plaintiff disputes that the January 8, 2021 incident was investigated as possible insubordination.  [Doc. 95 at 3 ¶ 21].  Although Plaintiff is correct that one witness did not characterize the incident as insubordination, [Doc. 88-13], Sheriff McDonald's statement indicates that he believed Plaintiff's conduct could have been insubordinate, [Doc. 88-12].  Sergeant Van Zalinge's report reflects both accounts of the January 8 incident.  [Doc. 88-10 at 5–7].  The Court finds that any factual dispute on this point is neither genuine nor material.

[4] *See, e.g.*, *Sexual Assault Nurse Examiner*, Int'l Ass'n of Forensic Nurses, https://www.forensicnurses.org/page/AboutSANE (last visited Sept. 29, 2025).

15.    Plaintiff disagreed with the chosen course of action and complained to her superiors.  *See* [Doc. 95 at 9 ¶ 16; Doc. 97 at 2 ¶ 3; Doc. 88-10 at 5–7].  *See generally* [Doc. 88-21 at 143:3–146:10 (Plaintiff's account of the events on January 8, 2021 that led to her phone call with Sheriff McDonald in which the alleged insubordination occurred)].

16.    Based on the January 8, 2021 incident, Plaintiff's TikTok videos, and Plaintiff's communications with former RGSO employees about the investigation, Sergeant Van Zalinge completed an internal investigation report that identified several possible violations of RGSO policies.  *See* [Doc. 88 at ¶ 25; Doc. 95 at 4 ¶ 25; Doc. 88-10 at 5–10].

17.    After reviewing the results of the internal investigation, Sheriff McDonald concluded that Plaintiff had violated multiple RGSO policies, and terminated her employment on or about February 12, 2021.  [Doc. 88 at ¶ 26; Doc. 95 at 4 ¶ 26; Doc. 88-16].

## II.    Plaintiff's Allegations of Discrimination

18.    Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission, alleging discrimination based on disability, gender, national origin, and retaliation.  [Doc. 88 at ¶ 28; Doc. 95 at 2; Doc. 32 at ¶ 15].

19.    Regarding alleged national origin discrimination, Plaintiff testified that Sheriff McDonald would "refer to Latino[] [employees and detainees] as blackwater and sewer water in front of Plaintiff."  [Doc. 95 at 6 ¶ 48; Doc. 97 at 2 ¶ 6; Doc. 95-4 at 211:22–216:25].

20.    However, Plaintiff's supervisor, Sergeant Emily Lopez ("Sergeant Lopez"), testified that she has "never experienced any form of discrimination by RGSO and is

unaware of any member of RGSO staff using derogatory racial terms." [Doc. 88 at ¶ 51; Doc. 95 at 2; Doc. 88-25 at 68:1–22]; *see also* [Doc. 97-5].

21.     Regarding alleged disability discrimination, Plaintiff suffers from asthma and hypoglycemia. [Doc. 95 at 8 ¶ 11; Doc. 97 at 2 ¶ 4; Doc. 95-5 at 17:5–8, 21:4–11; Doc. 97-1 at 10, 42].

22.     Defendants knew of Plaintiff's medical conditions. [Doc. 95 at 9 ¶ 13; Doc. 97 at 2 ¶ 5; Doc. 95-4 at 63:12–64:13].

23.     Kimberly Woodke, PA-C ("Ms. Woodke"), was listed as Plaintiff's "treating physician" and testified that Plaintiff's medical records suggested that Plaintiff "has not needed her albuterol inhaler [for her asthma] which she has taken in the past as needed." [Doc. 88 at ¶¶ 32–33; Doc. 95 at 2, 4 ¶ 33; Doc. 88-20 at 1; Doc. 95-5 at 22:4–21].[5]

24.     Ms. Woodke testified that Plaintiff had a "history that she had been diagnosed previously with hypoglycemia" but that Ms. Woodke had never treated Plaintiff for hypoglycemia. [Doc. 88 at ¶ 34; Doc. 95 at 5 ¶ 34; Doc. 97 at 2 ¶ 34; Doc. 97 at 2 ¶ 4; Doc. 95-5 at 22:5–13].

25.     Ms. Woodke testified that she never prescribed a blood glucose monitor for Plaintiff to use to control her hypoglycemia, and that a blood glucose monitor can be purchased over the counter. [Doc. 88 at ¶ 34; Doc. 95 at 5 ¶ 34; Doc. 97 at 2 ¶ 34; Doc. 95-5 at 22:23–23:3, 24:23–25].

---

[5] None of the deposition testimony cited by Plaintiff suggests that she informed her supervisors of her asthma. *See* [Doc. 95-4 at 243:17–247:10, 252:22–253:8]. However, Defendants' Reply appears to concede that Defendants knew of Plaintiff's medical conditions. [Doc. 97 at 2 ¶ 5]. At a minimum, Defendants do not deny Plaintiff's factual assertion that they were aware of her asthma, and the Court deems this fact undisputed for purposes of the Motion. Fed. R. Civ. P. 56(e)(2).

26.    Because of RGSO's "no-bag" policy regarding personal items in the RGSO facility, Plaintiff used a box to carry her blood glucose monitor and other personal items into the dispatch room.  [Doc. 88 at ¶ 35; Doc. 95 at ¶ 35; Doc. 97 at 2 ¶ 5; Doc. 95-4 at 158:5–8].[6]

## ANALYSIS

### I.    Plaintiff's Claims Against the County

Defendants first argue that Plaintiff's claims fail to the extent they are asserted the County, because the County was not Plaintiff's "employer" for purposes of Title VII, the ADA, and CADA.  [Doc. 88 at 10–11].  The Court begins with Plaintiff's federal law claims before turning to her CADA claims.

### A.    Claims Under Title VII and the ADA

To bring a viable claim under Title VII, "a plaintiff must first prove the defendant was her employer." *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014).  Similarly, in the ADA context, a plaintiff must establish that the defendant was her employer in order to sue for a failure to accommodate.  *See Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213, 1221 (10th Cir. 2002).  "When a plaintiff asserts . . . that [she] is an employee of more than one entity under Title VII and the ADA, a plaintiff may establish liability under the joint-employer and single-employer tests." *United States v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224, 1258 (D.N.M. 2018) (citing *Bristol*, 312 F.3d at 1218).  The joint-employer test treats independent entities as joint employers if they "co-determine the essential terms and conditions of employment." *Bristol*, 312 F.3d at

---

[6] Whether Plaintiff's use of a box still violated RGSO policy is immaterial to the Motion. *See* [Doc. 97 at 2 ¶ 5].

1218. The single-employer test looks to whether the "two entities effectively constitute a single employer." *Id.* Plaintiff does not address the joint-employer test and argues only that she was effectively a County employee under the single-employer test. [Doc. 95 at 11–12]. The Court accordingly limits its analysis to the single-employer test.

In applying the single-employer test, the Court considers four factors: "(1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control." *Bristol*, 312 F.3d at 1220 (quoting *EEOC v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 571 (6th Cir. 1984)). The third factor—centralized control of labor relations—is generally the most significant. *Id.* Moreover, "the right to terminate employment is the most important aspect" of an entity's control over the employment relationship with a given employee. *Sandoval v. City of Boulder*, 388 F.3d 1312, 1323 (10th Cir. 2004) (citing *Bristol*, 312 F.3d at 1219).

In *Bristol*, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") applied the single-employer test in a nearly identical situation to this case. The plaintiff in *Bristol* had worked as a confinement officer for a county Sheriff's office and sought to bring ADA claims against both the Sheriff's office and the Board of County Commissioners. *Bristol*, 312 F.3d at 1215–16. The district court held that both the Sheriff's office and the Board were the plaintiff's employer. *Id.* at 1216. The Tenth Circuit disagreed. As the *Bristol* court explained:

> Under the Colorado constitution, the County Sheriff is a distinct position, separate from the Board of County Commissioners. *See* Colo. Const. art. XIV, § 6 (election of County Commissioners); § 8 (election of Sheriffs and other county officers). Sheriffs have exclusive control over the hiring and firing of their employees, Colo. Rev. Stat. § 30-10-506, and even self-imposed limitations on their right to discharge employees at will are invalid,

> *Seeley v. Bd. of County Comm'rs*, 791 P.2d 696, 700 (Colo. 1990) (en banc).  Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances—a power exclusively vested in the Colorado Sheriffs with respect to their deputies.  Colo. Rev. Stat. § 30-10-506; *Seeley*, 791 P.2d at 699.

*Bristol*, 312 F.3d at 1219.  Turning to the four-factor single-employer test, the Tenth Circuit acknowledged that there was some interrelation of operations; the Sheriff's office used the county's administrative services and was subject to the Board's "budgetary authority." *Id*. at 1220.  But there was no evidence suggesting that the Board and the Sheriff's office shared common management—the second factor—over the Sheriff's office's employees. *Id*.  And the fourth factor—common ownership and financial control—was "clearly irrelevant to a case involving governmental entities, which do not issue stock and are not owned by private parties."  *Id*.  Most importantly, under Colorado law, the Board had a "complete lack of control over labor relations in the Sheriff's office."  *Id*.  The Tenth Circuit found the third factor controlling and concluded that the plaintiff could not establish that the Board and the Sheriff's office effectively constituted a single employer.  *Id*.

Although Plaintiff recites the four-factor test outlined in *Bristol*, she fails to explain why she satisfies the test or distinguish this case from *Bristol*.  [Doc. 95 at 11–12].  Plaintiff cites to evidence indicating that the County provided administrative support to RGSO. [*Id*.]; *see also* [*id*. at 7–8 ¶¶ 1–5].  For instance, the County's Human Resources department processed job applications and payroll for RGSO.  [Doc. 95-1 at 39:23–25, 40:18–41:10].  Some of Plaintiff's employment records list Plaintiff as a County employee. [Doc. 95-9 at 12–27].  As in *Bristol*, these facts relate to the first factor—interrelations of operation—and weigh in Plaintiff's favor.  *Bristol*, 312 F.3d at 1220.  But, like *Bristol*, there

is no evidence that the County and RGSO shared common management of RGSO employees, as relevant to the second factor.

As for the critical third factor, Plaintiff has submitted evidence that she was subject to certain County personnel policies.  [Doc. 95-9 at 24–25]; *see also* [Doc. 95-11 (County personnel policy manual)].  Based on these policies, specifically the "Disciplinary Action" chapter of the County's personnel policy manual, Plaintiff claims that she "serve[d] at the pleasure of the County."  [Doc. 95 at 7 ¶ 3 (citing [Doc. 95-11 at 17 § VIII.8-3])].  But the County's manual specifically exempts the RGSO from the "Disciplinary Action" chapter because "employment [with respect to RGSO] is regulated by statute."[7]  [Doc. 95-11 at 2].  Thus, although there is evidence that County policies governed some aspects of Plaintiff's employment, she has failed to adduce sufficient evidence to permit a reasonable jury to conclude that the County exercised any meaningful control over her employment relationship with the RGSO.  Plaintiff has not submitted evidence suggesting that the County participated in RGSO's decisions to hire, discipline, or fire her.  *See* [Doc. 88-1 (Plaintiff's notice of hiring, on RGSO letterhead); Doc. 88-9 (letter from Sheriff McDonald placing Plaintiff on administrative leave pending investigation); Doc. 88-16 (termination letter from Sheriff McDonald)].  Accordingly, in light of *Bristol* and the County's lack of control over Plaintiff's labor relations with RGSO, the Court concludes as

---

[7] Plaintiff suggests in passing that she is exempt from the statutory provision granting the Sheriff broad personnel authority over his employees, because that statute applies only to "deputies" and she was a dispatcher.  [Doc. 95 at 10–11]; Colo. Rev. Stat. § 30-10-506. In *Bristol*, however, the Tenth Circuit read this provision to apply to all Sheriff's office "employees," including the plaintiff "confinement officer," who does not appear to have held the title of "deputy."  312 F.3d at 1215, 1219.  Because Plaintiff does not meaningfully develop her argument on this point, the Court declines to make arguments on her behalf and follows *Bristol*'s broad interpretation of Colo. Rev. Stat. § 30-10-506.  *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015).

a matter of law that Plaintiff was not employed by the County for purposes of Title VII and the ADA.

Because Plaintiff has failed to establish an employment relationship between herself and the County, her Title VII and ADA claims against the County fail. *See Bristol*, 312 F.3d at 1221 (finding that no reasonable jury could find in plaintiff's favor on ADA claim where plaintiff had no employment relationship with defendant); *Knitter*, 758 F.3d at 1225 (reiterating that Title VII claims fail if plaintiff cannot prove that defendant was her employer). The Motion is respectfully **GRANTED** as to Plaintiff's ADA and Title VII claims against the County.

## B.    Claims Under CADA

The Court declines to apply this result substantively to Plaintiff's CADA claims against the County. Both Parties appear to assume that the single-employer test should also control Plaintiff's CADA claims. *See* [Doc. 95 at 10–12; Doc. 97 at 3–4]. But the Parties have not identified—nor has the Court's independent research revealed—any decision by the Colorado Supreme Court or Colorado Court of Appeals that adopts the single-employer or joint-employer tests announced in *Bristol*. Nor has the Court found any Colorado state court cases addressing the proper interpretation of "employer," as defined in CADA, when a plaintiff asserts that she was employed by more than one entity. *See* Colo. Rev. Stat. § 24-34-401(2). Because this is a novel question of state law, the Court instead respectfully declines to exercise supplemental subject matter jurisdiction over Plaintiff's CADA claims against the County.

Federal courts exercise supplemental jurisdiction over state law claims when the state claims "form part of the same case or controversy" as federal claims. 28 U.S.C.

§ 1367(a). But supplemental jurisdiction "need not be exercised in every case in which it is found to exist." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The Court has discretion to decline supplemental jurisdiction if, inter alia, a claim "raises a novel or complex issue of state law." § 1367(c)(1); *see also Gibbs*, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). A novel question of state law may exist where "there is no controlling precedent on the issue." *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1085 (10th Cir. 2011).

In the absence of any binding authority from the Colorado Supreme Court or persuasive guidance from the Colorado Court of Appeals, this Court exercises its judicial humility and respectfully declines to decide the novel state law question of whether the single- and joint-employer tests apply under CADA. To be sure, "CADA cases often look to Title VII where the relevant CADA language parallels Title VII." *Williams v. Dep't of Pub. Safety*, 369 P.3d 760, 771 n.2 (Colo. App. 2015). And "[w]henever possible, the CADA should be interpreted consistently with the [ADA]." *Tesone v. Colo. High Sch. Activities Ass'n*, 140 P.3d 249, 253 (Colo. App. 2006). But the decision of whether to adopt the single- or joint-employer tests is not a matter of statutory interpretation. Title VII and the ADA both define "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year . . . ." 42 U.S.C. § 12111(5)(A); 42 U.S.C. § 2000e(b). CADA defines "employer" as "the state of Colorado or any political subdivision, . . . and every other person employing persons within the state." Colo. Rev.

Stat. § 24-34-401(3).  The Court perceives nothing in the respective statutory texts that accounts for a scenario where, as here, a court must decide whether a plaintiff was employed by more than one entity.  Nor, evidently, did the Tenth Circuit.  In *Bristol*, the Tenth Circuit did not derive the single- and joint-employer tests based on the plain text of Title VII and the ADA's definition of "employer."  *See* 312 F.3d at 1217–18.  Rather, in an exercise of common-lawmaking, the *Bristol* court adopted out-of-circuit case law to provide a test for cases in which a plaintiff may have had more than one "employer."  *See id.*

It is for the Colorado Supreme Court to decide whether to adopt the federal approach in CADA cases presenting this scenario.  Absent any clues in the statutory text, this Court respectfully declines to make a guess as to how the Colorado Supreme Court, will decide the issue.  *See Merrifield*, 654 F.3d at 1085–86 ("An authoritative state court ruling on the novel state-law claim should be permitted, instead of a guess or uncertain prediction by a federal court." (cleaned up)).  Because the Court declines to exercise supplemental jurisdiction over Plaintiff's CADA claims against the County, these claims are **DISMISSED without prejudice**.  *See VR Acquisitions, LLC v. Wasatch Cnty.*, 853 F.3d 1142, 1149–50 (10th Cir. 2017) (ordering dismissal without prejudice where district court declined supplemental jurisdiction over state law claims).

## II.    Failure-to-Accommodate Claims

Defendants next argue that Plaintiff's failure-to-accommodate claims fail because she is not disabled for ADA purposes and, even if she were, she did not notify RGSO of her disability.  [Doc. 88 at 11–14].  The ADA forbids an employer from discriminating "against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The ADA

defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." § 12112(b)(5)(A). Courts resolve failure-to-accommodate claims using a modified version of the *McDonnell Douglas* burden-shifting framework that generally governs discrimination claims. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017). At the first step of this framework, the plaintiff bears the burden of establishing a prima facie claim for failure to accommodate. *Id.*; *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020). To establish a prima facie claim, Plaintiff must show that (1) she was disabled, (2) she was otherwise qualified, (3) she requested a plausibly reasonable accommodation, and (4) RGSO refused to accommodate her disability. *Aubrey*, 975 F.3d at 1005. This burden is "not onerous," *id.*, but Plaintiff must put forward at least some "evidence sufficient to make a facial showing" on each of the four elements, *Punt*, 862 F.3d at 1050 (quotation omitted). Defendants attack the first and third elements of Plaintiff's prima facie case, arguing that Plaintiff has not demonstrated a disability within the meaning of the ADA and that Plaintiff did not actually request any accommodations from RGSO.[8] [Doc. 88 at 12–14].

---

[8] CADA adopts the ADA's definition of "disability." Colo. Rev. Stat. § 24-24-301(7). CADA discrimination claims are also subject to the *McDonnell Douglas* burden-shifting framework. *See Colo. C.R. Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 400–01 (Colo. 1997). The Court thus analyzes Plaintiff's ADA and CADA failure-to-accommodate claims together. *See Green v. U.S. Anesthesia Partners of Colo., Inc.*, 624 F. Supp. 3d 1201, 1220 (D. Colo. 2022) (analyzing both ADA and CADA failure-to-accommodate claims under the modified *McDonnell Douglas* framework), *aff'd*, No. 22-1319, 2023 WL 7015660 (10th Cir. 2023).

## A.    Disabled Within the Meaning of the ADA

The ADA defines a disability as, inter alia, "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  "To satisfy this definition, a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities."  *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (quotation omitted).  The first two requirements present questions of law. *Id.*  The third requirement, however, ordinarily presents a question of fact as to whether the impairment substantially limits a major life activity.  *Id.*

In the Motion, Defendants do not contest that Plaintiff has two recognized impairments—hypoglycemia and asthma—that impact major life activities.  *See* [Doc. 88 at 12].  Instead, they argue that "there is still no evidence that Plaintiff's condition was such that it *substantially* limited one or more major life activities."  [*Id.*].

### 1.    Substantial Limitation

"An impairment is substantially limiting when it renders an individual either unable or significantly restricted in her ability to perform a major life activity compared to the average person in the general population."  *Johnson v. Weld Cnty*., 594 F.3d 1202, 1218 (10th Cir. 2010) (quotation omitted).  A "medical diagnosis" alone is insufficient to show that the plaintiff has experienced a substantial limitation.  *Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010).  "[T]he ADA requires plaintiffs to offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial."  *Id.* (quotation omitted).  The substantial limitation inquiry is based on the plaintiff's "own experience," "because an impairment that is disabling for some may not

be disabling for others." *Carter*, 662 F.3d at 1144 (quotations omitted).  In considering a plaintiff's experience with her impairment, the Court considers three factors:  "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment."  *Id.* at 1145. (quotation omitted).

### a.    Asthma

Regarding Plaintiff's asthma, Defendants contend that there is no evidence that her asthma substantially limited any major life activity.  [Doc. 88 at 13].  In Response, Plaintiff contends that she "has provided medical documentation substantiating her medical conditions of asthma and hypoglycemia."  [Doc. 95 at 13].  She argues that her "asthma and hypoglycemia substantially limit one or more of her major life activities, such as breathing and her blood sugar levels."  [*Id.*].  But beyond this cursory statement, Plaintiff provides no other argument—let alone meaningful analysis—as to why her asthma substantially limited her ability to breathe.  *See* [*id.*].

Nor is the broad swath of evidence cited by Plaintiff sufficient to carry her burden to produce some evidence of a substantial limitation.  *See* [*id.*].  To the extent Plaintiff contends that her "medical documentation" corroborates her asthma, the portion of her medical records before the Court reflects her diagnosis of "mild intermittent asthma, uncomplicated" but redacts the description of her "symptoms."  [Doc. 97-1 at 10; Doc. 95 at 13].  The medical record associated with the diagnosis of "mild intermittent asthma, uncomplicated" does not suggest that she was presenting for treatment of breathing symptoms.  *See* [Doc. 97-1 at 10–11].  Instead, the record reflects that the contact was a

phone consult; that the Patient, i.e., Plaintiff, was not in distress; and her chief complaint was "refills." [*Id.* at 11].

Based on Plaintiff's medical records, Ms. Woodke testified that Plaintiff has been diagnosed with "uncomplicated mild intermittent asthma." [Doc. 95-5 at 17:5–8]. Ms. Woodke did not, however, explain what symptoms this form of asthma would present— for Plaintiff or in general—and testified that she did not treat Plaintiff for asthma. [*Id.* at 18:4–19; 23:4–11]. Ms. Woodke did testify that Plaintiff was prescribed one inhaler to take daily as a "controlling medicine" and another inhaler as a "rescue inhaler," to be used "as needed." [*Id.* at 18:8–11, 20:4–16]. But there was no discussion of how asthma impacted Plaintiff's ability to breathe, how often such symptoms would occur, or what symptoms even prompted a physician to prescribe those inhalers in the first instance. Similarly, Plaintiff's deposition testimony repeatedly references her asthma diagnosis and inhalers without giving any details as to her symptoms. *See, e.g.*, [Doc. 95-4 at 37:14– 38:8 (testifying that certain cleaning chemicals "triggered" Plaintiff's asthma without indicating any symptoms); *id.* at 233:21–234:4 (referencing asthma "symptoms" in general)].

Even viewing the record in the light most favorable to Plaintiff, and despite the ample evidence demonstrating that Plaintiff experienced *some* form of "uncomplicated mild intermittent asthma," there is no evidence of Plaintiff's symptoms or how those symptoms affected her ability to breathe—or any other life activity. To be sure, asthma may in some cases substantially impair an individual's ability to breathe. *Cf. Albert v. Smith's Food & Drug Ctrs.*, 356 F.3d 1242, 1250–51 (10th Cir. 2004) (finding plaintiff provided sufficient evidence of substantial limitation to avoid summary judgment where

plaintiff suffered from "severe persistent asthma" that was "difficult to control," caused plaintiff to be "symptomatic most of the time," and forced her to avoid "a wide variety of everyday situations"). But asthma and other breathing difficulties "do not automatically constitute a disability." *Ngiendo v. Asset Campus USA*, No. 2:20-cv-02393-HLT, 2023 WL 2770192, at *8 (D. Kan. Apr. 4, 2023) (collecting cases). Absent evidence of Plaintiff's "own experience" with any asthma-related breathing difficulties, the Court cannot evaluate the "nature and severity" of Plaintiff's asthma, the duration of her asthma and associated symptoms, or any long-term effects. *See Carter*, 662 F.3d at 1143, 1145. Accordingly, because Plaintiff does not produce evidence showing that her asthma substantially limited her ability to breathe or any other major life activity, she fails to create a genuine dispute of fact as to whether her asthma rendered her disabled within the meaning of the ADA. *Id.* at 1143. The Court thus concludes that Plaintiff has failed to establish a prima facie failure-to-accommodate claim based on her asthma.

### b.    Hypoglycemia

Plaintiff's argument regarding her hypoglycemia is similarly cursory. As with her asthma, Plaintiff asserts that "medical documentation" substantiates her diagnosis but does not explain how her blood sugar levels fluctuate or how such fluctuations impact her life, or how her hypoglycemia would significantly restrict any activity as compared to the general population. [Doc. 95 at 13–14]. Again, merely pointing to a diagnosis is insufficient to establish a substantial limitation. *Wilkerson*, 606 F.3d at 1262. And the Court will not search for evidence or make arguments on Plaintiff's behalf. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998). Because Plaintiff fails to meet her prima facie requirement to demonstrate that she is disabled, the Court need not reach the

remaining elements of her ADA claim. *Cf. Punt*, 86 F.3d at 1050 (considering only the third element of a prima facie failure-to-accommodate claim where plaintiff failed to establish that element as a matter of law). The Motion is respectfully **GRANTED** as to Plaintiff's failure-to-accommodate claims.

## III.    Retaliation Claims

Defendants next seek summary judgment against Plaintiff's retaliation claims under Title VII and CADA. The Court addresses these claims together. *See Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1107 n.2 (D. Colo. 2021) (recognizing that the "substantive analysis" for CADA and Title VII retaliation claims is "identical"). Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Retaliation claims under this provision are subject to the *McDonnell Douglas* burden-shifting framework. *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018). Thus, as with Plaintiff's ADA claim, she bears the initial burden of establishing a prima facie case of retaliation. *Id.* To meet that burden, Plaintiff must demonstrate that "(1) she engaged in protected opposition to discrimination; (2) [RGSO] took an adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse action." *Id.* (quotation omitted).

With respect to the first element—protected opposition to discrimination—Plaintiff must show that she acted on a "reasonable good-faith belief that the opposed behavior was discriminatory." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1016 (10th Cir. 2004). Courts do not require the "protected opposition" to take any particular form; anything from "filing formal charges to voicing informal complaints to superiors" may suffice. *Id.* at 1015.

However, "[o]pposition to an employer's conduct is protected by § 2000e-3(a) only if it is opposition to a 'practice made an unlawful employment practice by [Title VII].'" *Peterson v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (quoting § 2000e-3(a)). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]." *Hinds v. Spring/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). "[T]he absence of such a reference [to alleged discrimination] can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." *Peterson*, 301 F.3d at 1188.

Defendants contend that Plaintiff's asserted protected activity—her January 8, 2021 complaint that RGSO failed to provide adequate medical care to a female detainee—does not amount to protected opposition under Title VII. [Doc. 88 at 16–17]. In Defendants' view, Plaintiff's complaints were motivated by a mere "disagreement" with Nurse Herrera's "medical decision," and "[d]isagreements do not rise to the level of discriminatory conduct." [*Id.* at 17]. Plaintiff responds that she "engaged in protected conduct when she complained about [Sheriff] McDonald's discriminatory treatment of female inmates." [Doc. 95 at 16]. But Plaintiff's argument relies on portions of the record that simply do not support the proposition that her January 8, 2021 complaint alleged discriminatory treatment of female inmates. *See* [*id.* at 9 ¶¶ 16–17; Doc. 95-2 at 61:13–62:25; Doc. 95-8 at 38:9–47:16; Doc. 88-9; Doc. 88-15]. Sheriff McDonald's written statement, the statements in Sergeant Van Zalinge's report, and Plaintiff's own deposition all indicate that Plaintiff's complaint focused solely on her belief that RGSO was not

providing adequate medical care to a detainee. [Doc. 88-12; Doc. 88-10 at 5–7; Doc. 88-21 143:3–146:10]. None of this evidence shows that Plaintiff's complaint referenced a perceived difference in the way RGSO treated male and female detainees.

The Court respectfully finds that Plaintiff has failed to adduce evidence demonstrating that her January 8, 2021 complaint was motivated by a belief that her superiors engaged in unlawful sex discrimination or that she communicated such a belief to Sheriff McDonald or other RGSO staff. This is fatal to her retaliation claims. *See, e.g.*, *Peterson*, 301 F.3d at 1188–89 (affirming summary judgment where plaintiff's complaint to superiors did not reference unlawful discrimination); *Hinds*, 523 F.3d at 1202–03 (holding that plaintiff's emails to defendant criticizing internal policies and alleging retaliation were not protected opposition because plaintiff did not mention age or age discrimination); *Brown v. Keystone Learning Servs.*, 804 F. App'x 873, 881–82 (10th Cir. 2020) (concluding that plaintiff failed to establish prima facie retaliation claim where plaintiff's letter to superiors "did not mention or imply racial discrimination" and thus did not constitute protected opposition). Because Plaintiff fails to establish the first element of her prima facie case for retaliation, the Court need not reach the Parties' arguments as to the remaining elements. The Motion is respectfully **GRANTED** with respect to Plaintiff's retaliation claims.

## IV.    Discrimination and Harassment Claims

Finally, Defendants seek summary judgment on Plaintiffs discrimination and harassment claims under Title VII and CADA. As with Plaintiff's other claims, the Court addresses these claims together. *See, e.g.*, *Clayton v. Dreamstyle Remodeling of Colo., LLC*, No. 20-cv-02096-KLM, 2022 WL 910957, at *18 (D. Colo. Mar. 28, 2022) (reiterating

that CADA claims, including hostile work environment claims, are subject to the same standards as their Title VII counterparts).  Moreover, because Plaintiff's Response only addresses this claim under a hostile work environment theory, [Doc. 95 at 19–20], the Court limits its evaluation of her discrimination claims accordingly.

Title VII prohibits an employer from discriminating against "any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  As with other Title VII claims, a claim for discrimination based on hostile work environment is governed by the *McDonnell Douglas* framework.  *Throupe v. Univ. of Denv.*, 988 F.3d 1243, 1251 (10th Cir. 2021).  To avoid summary judgment, Plaintiff must show that a reasonable jury could find that (1) she was discriminated against based on her sex and national origin, and (2) "the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of [her] employment and created an abusive working environment." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1227 (10th Cir. 2022) (quotation omitted); *accord Throupe*, 988 F.3d at 1251.  Where, as here, a plaintiff alleges that she experienced discrimination based on multiple protected characteristics, the Court may "aggregate evidence of [national origin-based] hostility with evidence of sexual hostility to establish a hostile work environment."  *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997); *see also Ford*, 45 F.4th at 1227 (holding that aggregation is "permissible" but not required).

In evaluating whether the alleged discrimination rises to the level of a hostile work environment, the Court is mindful that "Title VII does not establish a general civility code for the workplace."  *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir. 2012)

(cleaned up). "Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Id.* at 664. A plaintiff must point to a "steady barrage of opprobrious [discriminatory] comments" rather than "a few isolated incidents." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1223 (10th Cir. 2015) (quotations omitted). And the work environment must be "both subjectively *and* objectively hostile or abusive." *Id.* at 1222 (quotation omitted). Courts thus assess the alleged discriminatory conduct based on the totality of the circumstances, considering factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotation omitted). Ultimately, "whether conduct qualifies as severe or pervasive is particularly unsuited for summary judgment because it is quintessentially a question of fact." *Ford*, 45 F.4th at 1228 (quotation omitted).

Here, Plaintiff asserts that she was subject to a hostile work environment based on Sheriff McDonald's repeated references to individuals of Hispanic ancestry as the "blackwater association," which she and other employees understood to mean "sewer water." [Doc. 95 at 20; Doc. 95-4 at 211:22–212:6, 213:11–214:6]. She also testified that Sheriff McDonald and other "White employees" "frequently" referred to Hispanic employees and detainees as "ghetto." [Doc. 95-4 at 212:1–24, 214:9–16]. With respect to sex, Plaintiff asserts that the RGSO refused to schedule female employees for the night shift based on purported "safety" concerns.[9] [Doc. 95 at 20; Doc. 95-4 at 47:8–48:5; Doc.

---

[9] RGSO apparently permitted female employees to cover the night shift if a scheduled male employee was unable to work. *See* [Doc. 95-4 at 47:16–21].

95-7 at ¶ 10].  Plaintiff also testified that RGSO provided only unisex uniforms that did not fit the "female body" and refused to reimburse her after Plaintiff purchased her own uniform.  [Doc. 95-4 at 223:11–226:4].  Plaintiff stated that she complained to HR about Sheriff McDonald's comments and the night shift policy, but no action was ever taken. [*Id.* at 45:14–46:6].

Defendants do not specifically address Plaintiff's hostile work environment theory in their Motion or Reply.  *See* [Doc. 88; Doc. 97].  With respect to the first element of a hostile work environment, Defendants do not dispute whether the alleged comments by Sheriff McDonald and other employees were "based on" her sex or national origin. Defendants briefly suggest that Sheriff McDonald may have intended his "blackwater association" comments to apply to the entire RGSO detention center staff rather than just Hispanic employees.  [Doc. 97 at 2 ¶ 6].  But "it is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind."  *Lounds*, 812 F.3d at 1220–21 (brackets and quotation omitted).  Moreover, Plaintiff testified that she and other Hispanic employees perceived this comment as discriminatory.  [Doc. 95-4 at 211:22–212:6, 213:11–214:6].  Even if Sheriff McDonald's comments could be construed as facially neutral, it is the province of the jury to decide whether an inference of discrimination can be drawn from his conduct.  *Sanderson v. Wyo. Hwy. Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020).  And none of Defendants' arguments dispute that RGSO's uniform policy and alleged policy against scheduling female employees for night shifts would discriminate against female employees based on their sex.  The Court finds that a reasonable jury could conclude that Sheriff McDonald's comments amounted to discrimination based on national origin, and that RGSO's alleged

uniform and night shift policies amounted to discrimination based on sex. *Cf. Maldonado v. City of Altus*, 433 F.3d 1294, 1304–08 (10th Cir. 2005) (concluding that, for purposes of hostile work environment claim brought by Hispanic employees, a reasonable jury could infer an intent to discriminate based on national origin from an English-only workplace policy), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

As for the second element, Defendants do not argue that the various discriminatory conduct alleged by Plaintiff was insufficiently pervasive or severe to amount to a hostile work environment. Defendants do point to testimony from Plaintiff's supervisor—who is also a Hispanic woman—stating that she never heard any discriminatory comments at the RGSO and never had any problems with RGSO's uniforms.[10] [Doc. 88 at 19–20; Doc. 88-25 at 31:2–13, 68:1–22]. But at the summary-judgment stage, the Court cannot weigh competing testimony regarding the work environment at RGSO. *Fogarty*, 523 F.3d at 1165. Although Plaintiff's testimony does not specify exactly how many times Sheriff McDonald repeated his comments, the pervasiveness inquiry is not a "counting measure." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 959 (10th Cir. 2012). Viewing the record in the light most favorable to Plaintiff, and based on the aggregate evidence of Sheriff McDonald's repeated insensitive remarks, the alleged discriminatory policies, and the fact that Plaintiff complained to HR more than once to no avail, the Court concludes that a reasonable jury could find that Plaintiff experienced severe or pervasive discrimination that amounted to a hostile work environment based on her sex and national

---

[10] The portion of testimony identified by Defendants does not address the alleged RGSO policy prohibiting female employees from being scheduled for night shifts. *See* [Doc. 88-25 at 31:2–13, 68:1–22].

origin.  *Cf. id.* at 958–59 (finding genuine factual dispute as to the pervasiveness of harassment where plaintiff presented evidence of "at least a dozen racially offensive comments and jokes over . . . fourteen months," many of which were made by a supervisor, and plaintiff complained about the conduct to her supervisors).[11]  Accordingly, the Motion is respectfully **DENIED** as to Plaintiff's hostile work environment claims based on sex and national original discrimination.

<strong>CONCLUSION</strong>

For the reasons set forth herein, **IT IS ORDERED** that:

(1)  Defendants' Motion for Summary Judgment [Doc. 88] is **GRANTED in part** and **DENIED in part**;

(2)  Summary judgment is **GRANTED** against Plaintiff's Title VII and ADA claims against the County;

(3)  Because the Court declines to exercise supplemental subject matter jurisdiction over Plaintiff's CADA claims against the County, these claims are **DISMISSED without prejudice**;

(3)  Summary judgment is **GRANTED** against Plaintiff's failure-to-accommodate claims against RGSO;

(4)  Summary judgment is **GRANTED** against Plaintiff's retaliation claims against RGSO;

---

[11] The Court does not reach the latter two steps of the *McDonnell Douglas* framework because Defendants do not argue that any of the alleged conduct related to the hostile work environment claims was motivated by a non-discriminatory purpose.  Defendants argue that Plaintiff's termination was justified by her violations of RGSO policy, [Doc. 97 at 8–10], but Plaintiff does not assert that her termination contributed to her hostile work environment, [Doc. 95 at 20–21].

(5)    The Motion is **DENIED** as to Plaintiff's discrimination claims against RGSO

based on a hostile work environment; and

(6)    A telephonic Status Conference is **SET** for October 7, 2025 at 10:00 a.m. for

purposes of setting a Final Pretrial/Trial Preparation Conference and trial in

this matter.  Counsel for the Parties shall participate using the following dial-

in information:  571-353-2301; Access Code:  783456374.

DATED:  September 29, 2025                    BY THE COURT:

                                             _____
                                             Nina Y. Wang
                                             United States District Judge